*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ESTATE OF WILLIAM HOWARD MCDUFFIE-CONNOR, by its Personal Representative, CHANDRA MCDUFFIE,

Plaintiff-Appellee,

v

SCOTT M. NEAL and MEMBERSELECT INSURANCE COMPANY,

Defendants,

and

NSS CONSTRUCTION, INC.,

Defendant-Appellant.

UNPUBLISHED
February 8, 2024

Nos. 358870, 358987, 360585
Wayne Circuit Court
LC No. 20-007497-NF,
20-012305-NF, 20-007497-NF

Before: GADOLA, P.J., and BORRELLO and HOOD, JJ.

HOOD, J. (*dissenting*.)

I respectfully dissent. The trial court correctly concluded that genuine questions of material fact remained surrounding the fatal crash that started this case. The difficulty in reconciling eyewitness testimony with the technical evidence contained in the Michigan State Police (MSP) investigative report highlights the correctness of the trial court's conclusion. Further, defendant NSS Construction, Inc. (NSS) destroyed business records that would have shed light on critical issues in this case, including its maintenance of the truck involved in the wreck, its hiring, retention and training of defendant Scott M. Neal, and whether Neal actually performed (or regularly performed) a pre-trip inspection of the truck as required. This is a case with messy facts for both sides that requires a jury to sort out.

For these reasons and those stated below, I disagree with the conclusions related to spoliation of the business records in Docket Nos. 358870 and 358987, and I disagree with the

conclusions that stem from the genuine issue of material fact related to the operation and maintenance of the truck in Docket No. 360585. These conclusions stem from a different view and understanding of the body of evidence before the trial court. In my view these facts support the trial court's conclusion that genuine questions of material fact remain.[1]

## I. BACKGROUND

I agree with the factual background contained in the majority opinion with one crucial difference: based on the record before us, there is conflicting evidence of whether the driver, Neal, actually signaled (or was even able to signal) his intention to turn. This single fact issue bleeds into a variety of issues affecting this case's outcome, including the manner in which Neal was driving, whether he performed the required "pre-check" before getting behind the wheel, the maintenance of the truck, and NSS's hiring, training, and retention of Neal.

The sole eyewitness, Matthew Pace, testified that he saw the truck's right turn signal on and blinking for a while before Neal attempted to turn. This, however, conflicts with the MSP investigation report and related testimony that indicated that there was a wiring issue that caused the truck's turn signal to malfunction. According to the MSP investigation, this issue could not have been caused by the accident.

The majority briefly references the MSP report in relation to the trial court's findings, but it did not discuss the testimony of its author, Officer Ryan Wilson, formerly of MSP. Both Wilson's testimony and his report are critical to resolving the legal issues in this case. In the MSP report, Officer Wilson identified several mechanical issues with the truck that were not caused by the crash. First, and most critically, none of the turn signals were operable. The left front, right front, left rear, and right rear turn signals lit up but did not blink. In his testimony, Wilson explained that the light malfunction could not have been caused by the accident. This appears to directly conflict with Pace's testimony that he saw the light on and blinking. Pace and Wilson cannot both be correct. In addition to identifying inoperable turn signals, Wilson testified that five of the six clamp- or roto-type brakes were out of adjustment. The report also indicated that, due to the truck's manufacturing date, it had an automatic airbrake adjustment system which fails to compensate for wear. The report distinguished between violations that were caused by the accident and those that were not. It also noted which section of the federal regulations applicable to commercial motor vehicles the truck violated. For example, it identified each of the "inoperative turn signal[s]" as a violation of 49 CFR 393.9 ("393.9TS-Inoperative turn signal . . . ."). Likewise, it identified each of the five brake adjustment issues as a violation of 49 CFR 393.47(e) ("393.47E-

---

[1] I, however, agree with the majority's analysis related to NSS's spoliation argument as contained in Section II.A.4 (Docket No. 358870) and the estate's spoliation argument related to the dump truck as contained in Section II.A.1, 2, and 3. And I agree with the conclusion that the trial court did not abuse its discretion by ruling that plaintiff did not spoliate evidence by failing to preserve the Sebring or that NSS did not spoliate evidence by failing to preserve the truck, and I concur with the majority on these two points.

Clamp or Roto type brake out-of-adjustment . . . ."). Each of these issues provided a basis for the truck not to be on the road.

As discussed below, these issues are significant as it relates to NSS's maintenance of the vehicle, Neal's compliance with required pre-trip inspections that are required for commercial drivers before taking the vehicle on the road, see 49 CF 396.13, and NSS's training of Neal to conduct such checks. Standing alone, Wilson's report generates genuine questions about whether Neal activated the signal, whether Pace is lying or simply mistaken, whether the truck had other mechanical issues that contributed to the crash, and the calculation of comparative negligence.

Officer's Wilson's testimony amplifies these issues. Wilson worked for MSP for 10 years as a commercial vehicle enforcement officer. He received training for this type of investigation and had completed approximately 50 post-crash investigations.

During his testimony, Officer Wilson confirmed that all four turn signals turned on but did not blink. He explained that someone not familiar with this malfunction on this particular truck could mistake it for a brake light. (As discussed below, this bears on many issues in this case, particularly the issue of contributory negligence.) Based on his training and examination of the vehicle, the turn signal issue likely was an issue that predated the crash. During his testimony, he explained that before beginning a shift a driver is required to perform a pre-trip inspection (or "pre-trip") which, among other things, requires them to check the lights and the brakes. According to Wilson, had Neal performed a pre-trip inspection he would have found this issue.

Regarding the brakes, Wilson testified that the truck had brake issues that could not have occurred overnight and were more indicative of lack of maintenance and upkeep. He explained that based on the push rod movement, he determined that five of the six brakes on the vehicle were out of alignment. The brakes were in this condition prior to the crash. Wilson described this as a "serious safety violation." He explained, "[I]f I were to stop this vehicle just on a regular traffic stop and complete an inspection, the vehicle would be placed out of service until those violations were corrected." Wilson also explained that the driver of the vehicle should have discovered these violations before getting on the road if he "performed a correct pre-trip." And he opined that the violations were serious enough that the truck "should not have been on the motoring road." Because NSS's business records, including records of the truck's maintenance and Neal's training, were destroyed or disposed of after the accident but before suit, the body of evidence that would shed additional light on Neal's failure to perform a pre-trip is limited.

Put simply, Pace's testimony is not the only evidence about Neal's blinker or his signaling intention to turn. To the extent that a factfinder is going to rely on Pace's testimony, they have to reconcile his testimony with that of Wilson and the findings in Wilson's report which at least partially refute Pace's testimony. This might cause a factfinder to consider what other parts of Pace's testimony conflict with the universe of evidence in this case.[2]

---

[2] It is worth noting that Pace apparently was driving during his deposition, which was held via Zoom. During his testimony, he was rear-ended. The question of the admissibility of that conduct

For example, parts of Pace's testimony may conflict with the video, or are at least open to different interpretations. Pace indicated that he slowed down to let the decedent, William McDuffie-Connor enter the arterial lane. My review of the video indicates that Pace is more or less right behind Neal's truck before the accident or even speeds up to bogart or block McDuffie-Connor from entering the arterial lane. At best, the video of the crash is inconclusive. Because of its angle, the video only provides the viewer with a front-driver side view of the crash which occurred on the rear-passenger side of the truck. The viewer cannot see if the truck's turn signals are operating or if McDuffie-Connor signaled his intention to merge left. It does little to resolve the apparent discrepancy between Pace's testimony that he saw the turn signal blinking and Wilson's testimony and report that indicated that the truck's blinker was inoperable before the crash.

Wilson's testimony and the MSP report implicate many aspects of this case from the spoliation of business records analysis, to the duty owed by Neal and NSS, to application of the wrongful conduct rule if we were to get that far. I briefly discuss the most pronounced of these issues in turn.

## II. STANDARDS OF REVIEW

The majority correctly states the standards of review. We review de novo the trial court's decision to grant or deny summary disposition. *Meemic Ins Co v Fortson*, 506 Mich 287, 296; 954 NW2d 115 (2020). A motion under MCR 2.116(C)(10) "tests the factual sufficiency of a claim." *El-Khalil v Oakwood Healthcare Inc*, 504 Mich 152, 160; 934 NW2d 665 (2019) (emphasis omitted). In considering a motion under MCR 2.116(C)(10), the trial court "must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion." *Id*. Such a motion "may only be granted when there is no genuine issue of material fact." *Id*. "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ." *Id*. (quotation marks and citation omitted)..

Regarding spoliation, we review for an abuse of discretion the trial court's decision to sanction a party for spoliation of evidence. *Pugno v Blue Harvest Farms, LLC*, 326 Mich App 1, 24; 930 NW2d 393 (2018). An abuse of discretion occurs when the trial court's decision results in an outcome outside the range of principled outcomes. *Id*.

## III. DUTY AND BREACH

The trial court correctly concluded that there is a genuine issue of material fact as to whether the accident resulted from a breach of duty owed by Neal and NSS to McDuffie-Connor. The majority cites the correct legal standards for negligence and an action under the wrongful death statute. Negligence requires the plaintiff to prove (1) a duty owed, (2) breach of duty, (3) causation, and (4) damages. *Hannay v Dep't of Transp*, 497 Mich 45, 63; 860 NW2d 67 (2014). The wrongful death statute, MCL 600.2921, keeps claims alive following the death of a decedent

---

as evidence of Pace's inattentive driving, inattentive testimony, or both, is not presently before this Court.

and requires (1) death, (2) caused by a defendant's wrongful act or neglect, and (3) an independent cause of action. See *id*.; MCL 600.2922.

Regarding the facts, the majority posits that there were no facts suggesting that Neal was violating the law or any standard of care owed by a truck driver to other drivers, and the consequences (namely the fatal wreck) were not foreseeable. I disagree. Here, there is conflicting evidence about whether the turn signal was working on the truck Neal was driving. It is unclear from the video if he used his blinker. One witness, Pace, says he saw it activated and blinking. But the MSP investigation report indicated that it was not operational and that its malfunction was a wiring issue that could not have been caused by the accident.

Whether a turn signal was blinking (or even able to blink) may seem like a small enough issue until we drill down on the other facts that its nonfunctioning may impact. For example, Neal had a duty to make sure the truck was safe to operate before driving it by preforming a pre-trip check. See 49 CFR 396.13. Before driving a commercial motor vehicle, federal regulations require a driver to "[b]e satisfied that the motor vehicle is in safe operating condition," and under some circumstances review the last driver inspection report. See 49 CFR 396.13(a) and (b) (cross referencing 49 CFR 396.11(a)(2)(*i*)). Neal testified that he conducted such a pre-trip inspection, and Pace testified that the blinker was operating. As stated, their testimony conflicts with the MSP report that concluded that the turn signal was inoperable, and that its malfunction predated the crash. A reasonable juror could choose to believe the MSP report and Wilson's testimony over Neal and Pace's testimony. Having reached this conclusion, a reasonable juror could also conclude that Neal failed to identify this pre-crash malfunction because he failed to do the required pre-trip inspection. See 49 CFR 396.13. In other words, unless the turn signal inexplicitly began malfunctioning midtrip, its malfunction is potentially evidence that Neal did not conduct a pre-trip inspection at all, in violation of federal regulation. In reaching this conclusion, a juror would necessarily conclude that Neal testified falsely about the pre-trip. If a juror were to reach this conclusion, it would be reasonable to conclude that Neal breached his duty to McDuffie-Connor to make sure that his truck was in safe operating condition, and that NSS breached its duty to ensure that it properly trained and vetted Neal before it hired him or allowed him to operate its truck.

To be clear, the inoperable turn signal bears directly on causation and breach of duty, while other issues in Wilson's report bear indirectly on breach. If the turn signal was inoperable (lighting but not blinking) McDuffie-Connor may have interpreted the light as brake light instead of an intention to turn, thus, contributing to his accident. For example, there is no evidence that the truck's faulty breaks caused (or even affected) the crash leading to McDuffie-Connor's death. But the fact that Neal was on the road with five brakes out of adjustment, in violation of 49 CFR 393.47(e), is further evidence that he did not conduct a pre-trip inspection, in violation of 49 CFR 396.13(a), which is further evidence of breach. Put simply, this is evidence that he did not conduct an inspection that would have identified the inoperable turn signal in addition to the faulty breaks. Depending on the pervasiveness of the problem, it is also evidence that Neal did not review prior inspection reports, see 49 CFR 396.13(b) and 396.11(a)(2)(i), or that NSS did not maintain its trucks or adequately train its drivers. This bears on the duty that Neal and NSS owed to McDuffie-Connor not to put an unsafe vehicle on the road. Specific to Neal, it indicates that he failed to perform the pre-trip check for his turn signals and brakes. For NSS, this might imply that they did not vet Neal, did not train him, or did not discipline him. It also tends to suggest that NSS put

malfunctioning vehicles on the road as a matter of course. Admittedly, this is indirect evidence. NSS's business records would offer direct evidence of its hiring, training, and disciplining Neal, but, as stated, NSS destroyed those records.

I would note that this is one issue that separates this case from *Talley v Macomb Intermediate Sch Dist*, unpublished per curiam opinion of the Court of Appeals, issued November 29, 2018 (Docket No. 341980), the unpublished case on which NSS almost exclusively relies. First, in *Talley*, the driver signaled. *Id*. at 5. Beyond signaling, in *Talley* there was no indication that the driver failed to perform a pre-trip check that might have avoided the accident altogether. See *id*. at 1-2, 5-7. There was no indication that the bus in *Talley* was not safe for operation on the road. *Id*. This case is distinguishable from *Talley* if we consider the total body of evidence. Considering that Neal was driving a vehicle that was unfit for safe operation on the road and that NSS sent him out in such a vehicle, there seems to be at least a question of fact related to whether they breached a duty owed to McDuffie-Connor (and every other driver on Neal's path) and whether the breach of that duty contributed to the accident.

Separate from the truck's maintenance and operability, and Neal's duty to make sure the truck was in safe operating condition, Neal also had a duty to make sure his turn was clear. See MCL 257.648(1) ("The operator of a vehicle or bicycle upon a highway, before stopping or turning from a direct line, shall first determine that the stopping or turning can be made in safety and shall give a signal as required in this section."). The wrongful conduct rule does not extinguish the estate's claims because it applies when plaintiffs commit a criminal violation, not a civil infraction. See *Masrur v Regents of Univ of Mich*, 344 Mich App 102, 108, 111; 999 NW2d 55 (2022); *Varela v Spanski*, 329 Mich App 58, 81; 941 NW2d 60 (2019). But there are traffic laws that apply to Neal's turn, such as signaling and only turning when clear. See MCL 257.648(1) and (5) (providing requirements for specific signaling equipment for commercial motor vehicles). As stated above, Wilson's report and testimony, juxtaposed with Pace's testimony, creates a question as to whether Neal signaled. The video alone creates a question of whether he checked to make sure the turn was clear. See MCL 257.648. Further, NSS also had a duty to make sure that its drivers, like Neal, were operating safely.

Wilson's testimony and the MSP report highlight some of the questions that exist. But even if we were not to consider the report or Wilson's testimony, some of these questions still exist. Based on just the video there seems to be a question of whether Neal checked to see if his turn was clear. Considering that a reasonable juror could conclude that he did not do a pre-trip inspection and was driving an unsafe vehicle, a reasonable juror also could find that he and NSS violated duties owed to McDuffie-Connor.

## IV. COMPARATIVE NEGLIGENCE

Likewise, there was a genuine issue of material fact related to comparative negligence. Again, the majority states the correct standard for comparative negligence: Although Michigan's no-fault act has eliminated individual tort liability for most auto accidents, "[a] person remains subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle" where the injured person suffered death. See MCL 500.3135(1); MCL 600.2959 (reducing damages where wrongful death occurs "by the percentage of comparative fault of the person upon whose . . . death the damages are based . . . ."). In such a case, "[d]amages

must be assessed on the basis of comparative fault, except that damages must not be assessed in favor of a party who is more than 50% at fault." MCL 500.3135(2)(b). The majority correctly observes that the issue of respective percentages of fault are typically left to the fact finder. *Holton v A+ Ins Assoc, Inc*, 255 Mich App 318, 323-324; 661 NW2d 248 (2003). The question is whether reasonable minds could differ about the percentages of fault. See *id.*; *Rodriguez v Solar of Mich, Inc*, 191 Mich App 483, 488; 478 NW2d 914 (1991). In other words, if *no* reasonable juror could find that the defendant was more at fault than the plaintiff, then the trial court can consider comparative negligence and dismiss under MCR 2.116(C)(10). See *Huggins v Scripter*, 469 Mich 898 (2003).[3]

Here, the body of evidence supports a variety of reasonable conclusions for jurors. The majority correctly observes that a reasonable juror could find that McDuffie-Connor was attempting to pass on the right possibly in violation of MCL 257.637. See MCL 257.537 (providing the conditions under which a vehicle may lawfully overtake or pass another vehicle on the right). See also MCL 257.636 (passing generally). But a reasonable juror could also conclude that Neal was operating with malfunctioning turn signals (as evidenced by the MSP report), failed to perform a pre-trip inspection and then testified falsely about conducting an inspection (as suggested by the MSP reports inspection of the turn signals and breaks), and that he failed to confirm that his turn was clear in violation of MCL 257.648. If Neal was operating a truck with malfunctioning turn signals then comparative fault is up in the air and is best left to the jury. It turns on the juror's determination of whether the truck was operational before the juror can weigh that fact against the issues with McDuffie-Connor's driving. It also turns on the jury's decision about whether Neal breached his duty to make sure that his turn was clear. That McDuffie-Connor was driving in the curb lane does not dispose of this issue. On these issues, reasonable minds could differ. So I would not find error with the trial court's decision that a genuine issue of material fact exists.

## V. SPOLIATION OF BUSINESS RECORDS

All of these issues amplify the spoliation issue. Regarding spoliation, I agree with the majority that the truck and the Sebring would do little to clarify any of the issues in this case. Particularly regarding the truck, because we have the MSP report, it is hard to see how it would be material. NSS's records, on the other hand, appear to bear directly on the issue of the truck's maintenance and repairs, along with Neal's hiring, training, and disciplinary record. In other words, there is a direct line between NSS's now-destroyed records and evidence of whether it breached a duty owed to McDuffie-Connor.

---

[3] A Supreme Court order is binding "if it constitutes a final disposition of an application and contains a concise statement of the applicable facts and reasons for the decision." *Gabrielson v Woods Condo Ass'n, Inc*, ___ Mich App ___, ___ n 7; ___ NW2d ___ (2024) (Docket Nos. 364809 & 364813); slip op at 16 n 7 (quotation marks and citation omitted). The Supreme Court's order in *Huggins* is the final disposition on an application, and it contains a concise statement of the applicable facts and the reasons for the decision. It is therefore binding. *Id.* at ___; slip op at 16 n 7.

The majority correctly states the legal standard for spoliation. Even before a lawsuit starts, a party is obligated to preserve evidence that is material to litigation that is pending or reasonably foreseeable. *Brenner v Kolk*, 226 Mich App 149, 162; 573 NW2d 65 (1997). "Spoliation" occurs when a party fails to preserve this evidence. *Id*. See also *Ward v Consol Rail Corp*, 472 Mich 77, 85-86; 693 NW2d 366 (2005). The court may draw an adverse inference when the party (1) had the evidence under its control and could have produced it; (2) has no excuse for failing to produce the evidence; and (3) the evidence is material, non-cumulative, and not equally available to the other party. *Ward*, 472 Mich at 85-86. At the threshold, I acknowledge that the trial court's discussion and analysis of materiality was sparse. I nonetheless would conclude that it reached the correct conclusion albeit for the wrong (or poorly stated) reasons related to NSS's spoliation of business records.

First, on the issue of foreseeability, NSS should have (and apparently did) foresee litigation. See *Brenner*, 226 Mich App at 162 (holding that a party has a duty to preserve evidence material to litigation that is pending or reasonably foreseeable). We have held that, "[e]ven when an action has not been commenced and there is only a potential for litigation, the litigant is under a duty to preserve evidence that it knows or reasonably should know is relevant to the action." *Id*. One of its drivers was involved in an accident resulting in death. This probably is enough. At oral argument, the parties indicated that NSS's owner went to the scene of the accident on the day it happened.[4] MSP investigated the wreck. The investigation resulted in findings that NSS's truck should not have been on the road the day of the accident. At a minimum, this likely would result in an insurance claim investigation. It seems obvious that there would be litigation following a fatal crash involving an NSS driver and NSS truck. NSS should have foreseen that litigation was on the horizon and that records related to the truck's maintenance and hiring and training of the truck's driver would be important.

Regarding materiality, I agree with the majority's conclusion that the trial court's findings were insufficient, but I believe the trial court reached the correct outcome related to the business records even if for the wrong (or unstated) reasons. See *Gleason v Mich Dep't of Transp*, 256 Mich App 1, 3; 662 NW2d 822 (2003). The trial court did not adequately state its reasoning regarding materiality, but it largely reached the right result. The truck itself is not material; the MSP report accomplishes everything plaintiff could have conceivably required related to the truck's condition. The business records related to the truck's maintenance and Neal's employment *are* material, however. They potentially support the direct negligence against NSS for failing to maintain or repair the truck. And they potentially support claims of negligent hiring, retention, and training, related to NSS's relationship with Neal.

Additionally, separate from Wilson's testimony regarding the condition of the vehicle prior to the accident and its various violations, his testimony also implicated spoliation of business records. He testified that owners of vehicles like the truck at issue in this case are required to maintain records related to the truck's inspection and driver logs for potential audits by the U.S. Department of Transportation or the MSP investigating unit.

---

[4] Neal confirmed at his deposition that NSS's owner, Nick Schubeck, went to the scene of the accident on the day it happened.

I would further conclude that the sanctions were proportionate to the spoliation. When a party fails to preserve evidence, either negligently or deliberately, that the party knows or should know is relevant to potential litigation, and the other party is thereby unfairly prejudiced by the resultant inability to examine the evidence, the trial court has authority to sanction the party who failed to preserve the evidence. *Bloemendaal v Town & Country Sports Ctr, Inc*, 255 Mich App 207, 211-212; 659 NW2d 684 (2002). The trial court properly exercises its discretion when it "carefully fashions a sanction that denies the party the fruits of the party's misconduct, but that does not interfere with the party's right to produce other relevant evidence." *Id*. at 212. An appropriate sanction may be "the exclusion of evidence that unfairly prejudices the other party . . . ." *Brenner*, 226 Mich App at 161. A jury instruction regarding spoliation is warranted "if the evidence that is the subject of the instruction is (1) material, (2) not merely cumulative, and (3) not equally available to the opposite party." *Komendat v Gifford*, 334 Mich App 138, 150; 964 NW2d 75 (2020) (quotation marks and citation omitted).

Here, the sanctions included (1) the jury would be given Model Civil Jury Instruction 6.01(a) regarding spoliation, (2) NSS's affirmative defenses were stricken and could not be relied upon at trial, (3) NSS was barred from introducing any mitigating evidence regarding their business practices, employment practices, vehicle maintenance practices, and safety practices, and (4) NSS was ordered to pay costs of $3,500 to plaintiff. Though severe, this sanction was comparable with the probative value of the materials that NSS destroyed. This was an attempt to balance the prejudice the estate faced resulting from the lack of records related to Neal's employment and the vehicle's maintenance. These records, had NSS not disposed of them, would shed light on whether the turn signal was operational and potentially whether Neal actually performed a pre-check. For example, as Officer Wilson testified, owners of vehicles like the truck at issue in this case are required to maintain records related to the truck's inspection and driver logs for audit purposes. The content of these records (or the fact of their nonexistence prior to any spoliation) would shed light the truck's history of maintenance, history of inspections, and NSS's hiring, training, and discipline of its drivers including Neal. Aside from its reliance on the disposed truck, I would conclude that the trial court's sanctions were appropriate.

## VI. CONCLUSION

For these reasons I respectfully dissent. I would affirm the trial court's conclusions that genuine issues of material fact continue to exist so that the issues could be resolved at trial.

/s/ Noah P. Hood